MARK D. ROSENBAUM (SBN 59940)
(mrosenbaum@aclu-sc.org)
DAVID B. SAPP (SBN 264464)
(dsapp@aclu-sc.org)
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017
Telephone:   (213) 977-5220
Facsimile:   (213) 417-2220

HERNAN VERA (SBN 175149)
(hvera@publiccounsel.org)
LAURA FAER (SBN 223846)
(lfaer@publiccounsel.org)
ARIEL WANDER (SBN 246992)
(awander@publiccounsel.org)
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone:   (213) 385-2977
Facsimile:   (213) 385-9089

PAULA D. PEARLMAN (SBN 109038)
(paula.pearlman@lls.edu)
SHAWNA L. PARKS (SBN 208301)
(shawna.parks@lls.edu)
SURISA RIVERS (CA SBN 250868)
(surisa.rivers@lls.edu)
DISABILITY RIGHTS LEGAL CENTER
919 Albany Street
Los Angeles, CA 90015
Telephone:   (213) 736-8366
Facsimile:   (213) 487-2106

(Additional counsel listed on next page)
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CASEY A.; CARL C.; and MIGUEL B., by and through L.L., on behalf of themselves and all those similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>JON R. GUNDRY, in his official capacity, Interim Superintendent, Los Angeles County Office of Education; WILLIAM ELKINS, in his official capacity, Director, Los Angeles County Office of Education Division of Juvenile Court Schools; JESUS CORRAL, in his official capacity, Principal, Los Angeles County Office of Education Challenger Center School; and LOS ANGELES COUNTY PROBATION DEPARTMENT,<br><br>Defendants. | Case No:  CV 10-00192 GHK (FMOx)<br><br>**CLASS ACTION**<br><br>**First Amended Complaint For Violations Of:**<br><br>(1)  **42 U.S.C. Section 1983 (Due Process Clause of the 14th Amendment)**<br>(2)  **42 U.S.C. Section 1983 (Equal Protection Clause of the 14th Amendment)**<br>(3)  **42 U.S.C. Section 1983 (Due Process Clause of the 14th Amendment)**<br>(4)  **20 U.S.C. Sections 1400 et seq.**<br>(5)  **Article IX, Sections 1 and 5 of the California Constitution**<br>(6)  **Article I, Section 7(a) & Article IV, Section 16(a) of the California Constitution**<br>(7)  **Article I, Section 7(b) of the California Constitution**<br>(8)  **Miscellaneous Provisions of the California Education Code** |

1 | DENNIS D. PARKER
  | (dparker@aclu.org)
2 | (*Pro Hac Vice*)
  | LAURENCE M. SCHWARTZTOL
3 | (lschwartztol@aclu.org)
  | (*Pro Hac Vice*)
4 | AMERICAN CIVIL LIBERTIES UNION FOUNDATION
  | NATIONAL LEGAL DEPARTMENT
5 | 125 Broad Street, 18th Floor
  | New York, NY 10004
6 | Telephone:  (213) 549-2682
  | Facsimile:  (213) 549-2654
7 |

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The following allegations are based on information and belief, unless otherwise specified:

### JURISDICTION

1.      This court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331, because those claims arise under the Constitution of the United States and the laws of the United States, specifically the Individuals with Disabilities Education Improvement Act (IDEA), 20 U.S.C. Sections 1400 *et seq.*; under 28 U.S.C. § 1343(a)(3), because those claims seek to redress deprivations, under color of state authority, of rights, privileges and immunities secured by the United States Constitution; and under 28 U.S.C. § 1343(a)(4), because those claims seek to secure equitable relief under an Act of Congress, specifically under 42 U.S.C. § 1983. This court also has jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

2.      Pursuant to the Court's jurisdiction over this matter, Plaintiffs Casey A., Carl C., by and through his guardian ad litem, Kendra Tankersley, and Miguel B., by and through his guardian ad litem, L. L., bring this action on behalf of themselves and on behalf of all other persons similarly situated.[1]

### VENUE

3.      Venue is proper in the Central District of California under 28 U.S.C. § 1391(b) because Defendants are located in this District and all of the acts and/or omissions complained of herein have occurred or will occur in the District.

---

[1] Because, among other things, Carl and Miguel are minors and remain wards of the state either in custody or on probation, and, therefore, subject to serious risk of retaliation, pseudonyms are used to protect their identities and protect them from harm. Because, among other things, Plaintiff Casey remains on probation and subject to the supervision of agents of Defendant Los Angeles County Probation Department, and, therefore, subject to serious risk of retaliation, a pseudonym is used to protect his identity and protect him from harm. Because Miguel's guardian ad litem is his parent, a pseudonym is used to protect Miguel's identity.

## INTRODUCTION

4.     Courts have long recognized that education is critical to our democratic society and is the foundation of good citizenship because it instills cultural values, prepares children for a productive career, and allows children to become full participants in our polity. *See, e.g., Brown v. Board of Educ.*, 347 U.S. 483, 493 (1954). Furthermore, as the United States Supreme Court recognized over half a century ago, "it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." *Id.*

5.     Consistent with this understanding, every state in the union has established a system of free public schools and every state requires children to attend school under compulsory attendance laws. The decision by each state in our union to provide free public schools and require attendance by children in that state reflects that the importance of education is a notion deeply rooted in our nation's history and tradition.

6.     Moreover, "[s]ince its admission to the Union, California has assumed specific responsibility for a statewide public education system open on equal terms to all," *Butt v. The State of California*, 4 Cal. 4th 668, 680 (1992), and the California Supreme Court has repeatedly held that under the State Constitution, "education [is] a fundamental interest 'which [lies] at the core of our free and representative form of government." *Id.* at 683 (quoting *Serrano v. Priest* 18 Cal. 3d 728, 767-68 (1976) ("*Serrano II*") (bracket in original)).

7.     Juvenile detention facilities in California, including county probation camps, exist "solely for the purpose of rehabilitation and not punishment," *People v. Olivas*, 17 Cal. 3d 236, 254 (1976), and education is the "foundation for programming in most juvenile institutions," U.S. Department of Justice Office of Juvenile Justice and Delinquency Prevention, *Conditions of Confinement: Juvenile Detention and Corrections Facilities* 129 (1994).

8.     Juveniles detained in detention facilities, as wards of the state and with no choice but to attend the schools provided in these facilities, have a liberty interest in minimally adequate care and treatment, including a minimally adequate education, appropriate to the youth's age and circumstances, protected by the federal constitution.

9.     Juveniles detained in detention facilities in California also share in the guarantee of a fundamental right to equal educational opportunity protected by the State Constitution.

10.     Juveniles with qualifying disabilities who are detained in detention facilities also have a right to special education.

11.     California law provides that the County Board of Education shall provide for the administration and operation of juvenile court schools in conjunction with the county's chief probation officer, or a designee.  Defendants Robles, Elkins, and Ramos-Allen, as officers of the Los Angeles County Office of Education ("LACOE"), are therefore responsible, together with Defendant Los Angeles County Probation Department ("Probation" or "Probation Department"), for ensuring detained youth in Los Angeles County receive an education that complies with the state and federal constitutions and applicable state and federal laws.

12.     Nonetheless, Defendants have abdicated their core responsibility of providing education to youth forced to attend the school operated by LACOE while detained at the Challenger Memorial Youth Center ("Challenger" or "Camp Challenger"), a facility operated by Defendant Probation Department in Lancaster, California.  The violations of youth's rights and illegal deprivations of educational services at Challenger are rampant, widespread, and well-known, yet Defendants have allowed them to persist, despite their duties to ensure the provision of appropriate educational services to the youth at Challenger.  Specifically, Defendants have violated the rights of youths at Challenger as follows:

- Decisions on what services and class assignments students receive are not governed by what services will provide an educational benefit based on the student's specific needs, such that some students were deprived of needed educational services for months at a time;

- Despite the high incidence of reading deficits among the population of students served at Challenger and the central importance of literacy to any educational program, students are not systematically screened for reading problems and staff are not trained to provide the research-based interventions that are proven to help the students address their literacy deficits;

- Students who are functionally illiterate are routinely awarded credits, regardless of whether they master academic content and without efforts to address their illiteracy.  Consequently, students receive high school diplomas based simply on their time at Challenger, even when Defendants and their employees are aware that the student cannot read or write;

- Students are regularly deprived of the full 240 minutes of instruction mandated by state law and are not provided access to physical education classes required by state law;

- Teachers, without accountability or consequences, routinely deprive students of class time by showing up late to work, refusing to teach to the content standards for academic subjects, screening movies or reading books aloud that are not at all related to academic subjects, and refusing to grade assignments completed by students, thereby depriving students of any educational benefit;

- Students are routinely excluded from class, purportedly for disciplinary reasons, without any explanation of the reason for the suspension or an opportunity to challenge the basis for the deprivation of educational

services;

- Students are routinely removed from class, without cause or proper procedure, to perform tasks on Camp Challenger grounds, including painting, housekeeping and landscaping services;

- Students with disabilities are deprived of necessary special education services.

13. In short, Defendants have systematically denied youth at Challenger access to minimally adequate educational services, in violation of both federal and state law. The education program at Camp Challenger falls fundamentally below professional standards of care and denies youth access to a public education that will teach them the basic skills they need to succeed as productive members of modern society.

14. These illegal deprivations of educational services have been occurring at Challenger for several years and have been repeatedly documented in publicly available reports, yet Defendants have allowed them to persist.

15. Instead of attending to their mission of educating the juveniles in Camp Challenger, Defendants are simply ignoring it by allowing a system to operate without adequate oversight, accountability or professionalism. Defendants conduct, acts and omissions are ongoing.

16. The result is a generation of Los Angeles youth, already disadvantaged and challenged due to other factors, being deprived of constitutionally mandated educational services and the opportunity to learn despite Defendants' explicit statutory obligation to help rehabilitate them.

17. Plaintiff Casey A. ("Casey"), who is eighteen years old and a special education student, can neither read nor write. Although he was detained at Challenger and educated at Challenger Center School for most of his high school career, LACOE staff refused to provide him with the necessary instruction and

services to overcome his illiteracy.  Instead, LACOE staff excused Casey from reading assignments, read course materials aloud for him, and orally administered written tests to him, thus ensuring that he would not learn to read and write on his own.

18.    Regardless, Defendants continually awarded Casey passing grades in his classes, and in late 2009 awarded Casey a high school diploma despite Defendants' awareness of Casey's illiteracy and inability to complete written coursework on his own.  Among other violations, in addition, while he was still in school, Defendants routinely excluded Casey from instruction as punishment or to complete menial tasks, with no opportunity to challenge these exclusions, and in violation of federal and state law.

19.    Plaintiff Carl C. ("Carl"), who is seventeen years old and a special education student, has been enrolled in the school run by Defendants at Challenger for much of the last year and was tested at a  2nd grade reading level.  Among other violations, Defendants have routinely excluded Carl from classes, often as punishment for requesting additional instructional assistance, with no opportunity to challenge these exclusions and in violation of state and federal and state law and have denied him educational instruction appropriate to meet his needs.  Consequently, Carl has been and continues to be deprived of significant educational instruction in all areas, has fallen significantly behind and lacks nearly one third of the credits needed for graduation.

20.    On several occasions, Carl asked for Defendants to stop denying him educational services, but he received no relief or response.

21.    Plaintiff Miguel B. ("Miguel"), who is fifteen years old and a special education student, has been enrolled in the school run by Defendants at Challenger for much of the last year.  Among other violations, in late 2009, Defendant Probation confined Miguel in a solitary cell in the Special Housing Unit (SHU) containing only

a cot for more than two months.  During this time, Defendants provided Miguel with two hours or less of educational instruction per day in violation of state laws that establish the required minimum amount of daily instructional minutes and refused him access to state-mandated physical education and recreation and to educational textbooks and materials.

22.  During his confinement, Miguel would on some days receive no educational instruction at all, and on many other days Miguel's instruction would consist of copies of school materials shoved under his cell door.  On those days, he never saw a teacher or interacted with other students.

23.  Finally, during the months that he was confined in the SHU, Miguel was not allowed to set foot outside.  Due to Miguel's legitimate fear of retaliation, he was afraid to challenge these illegal conditions.

24.  The challenged policies and practices constitute a plain denial of juveniles' rights under the United States Constitution to a minimally adequate rehabilitative program, appropriate to their age and circumstances, while a ward of the state, and their fundamental right under the State Constitution to equal educational opportunity.

25.  In addition, the arbitrary exclusion of detained juveniles from educational instruction as punishment or for no reason at all, with no opportunity to challenge the exclusion, constitutes a violation of these juveniles' substantive and procedural due process rights under the United States and State Constitutions, as well as the specific rights delineated in the state education code.

26.  By and through their actions, Defendants are perpetuating irreparable harm on these disadvantaged youth by denying them basic educational opportunity and equality and severely limiting their prospects for graduation from high school, meaningful employment, and the possibility for post-secondary education.  In effect, Defendants are assuring that these youth have little to no chance of succeeding when

they transition back to the community and placing them at serious risk of recidivism.

27.     These constitutional and statutory deprivations constitute a shameful indictment of the empty services being provided to the youth that are supposed to be rehabilitated in Los Angeles juvenile camps. Defendants' acts and omissions are particularly shocking within the broader context of how juvenile probation camps in Los Angeles County operate. Despite costing an estimated $30,000 per year per bed to house minors at county juvenile detention camps, *see* Marcus Nieto, *County Probation Camps and Ranches for Juvenile Offenders* 13 (Nov. 2008), *available at* http://www.library.ca.gov/crb/08/08-016.pdf, Defendants have deprived and continue to deprive Plaintiffs and other wards at Challenger a minimally adequate education, the central component of any rehabilitative program for youths.

28.     Moreover, during much of the time Plaintiffs were detained at Challenger, the County of Los Angeles, through the Los Angeles County Probation Department, charged families $11.94 each day a youth was held at a Probation Department camp, purportedly to compensate the county for the rehabilitative services being provided to the youth. *See* Molly Hennessee-Fiske, *L.A. County Probation Department Suspends Aggressive Billing of Guardians*, L.A. TIMES (February 14, 2009).

29.     Plaintiffs seek declaratory and injunctive relief on behalf of themselves and a class of similarly situated youth to remedy the unconstitutional education conditions that exist at Challenger.

## PARTIES

30.     Plaintiff Casey A. is an eighteen-year old citizen of the United States and a resident of Los Angeles County, California. Between October 2005 and September 2009, Casey was detained on three separate occasions at the Challenger Memorial Youth Center in Lancaster, California, for a collective period of time of

approximately three years. Casey A. is a student eligible for special education services.

31.     Plaintiff Carl C. is a seventeen-year old citizen of the United States and resident of Los Angeles County, California. Between December 2007 and May 2008, Carl was detained at the Challenger Memorial Youth Center in Lancaster, California, for a collective period of time of approximately three months. Carl was detained at Challenger again in March 2009 and remains there at the present time. His projected release date is March 2010. Carl's education rights holder is contemporaneously filing a petition under seal with this court to act as his guardian ad litem. Carl C. is a student eligible for special education services.

32.     Plaintiff Miguel B. is a fifteen-year old citizen of the United States and resident of Los Angeles County, California.  Between the summer of 2009 and early 2010, Miguel was detained at the Challenger Memorial Youth Center in Lancaster, California. Miguel's parent is contemporaneously filing a petition under seal with this court to act as his guardian ad litem. Miguel B. is a student eligible for special education services.

33.     Defendant Darline P. Robles is the Superintendent of LACOE. She is sued in her official capacity. LACOE is a public agency with headquarters in Downey, California. Defendant Robles' official duties as LACOE Superintendent include direct supervisory responsibilities over LACOE's Division of Juvenile Court Schools, which operates the public schools at camps run by the Los Angeles County Department of Probation, including the school that Casey, Carl, and Miguel attended while they were housed at Challenger.

34.     In her official capacity, Defendant Robles is also statutorily responsible for superintending all of the schools in Los Angeles County, visiting and examining each school in the county at reasonable intervals to observe its operation and to learn of its problems, enforcing the course of study mandated by the state, enforcing the

use of state textbooks and instructional materials and of high school textbooks and instructional materials, ensuring that sufficient textbooks and instructions are being used and provided to the students, and otherwise ensuring that the rights of students to an education in compliance with state and federal statutes and constitution are upheld.

35.    Defendant William Elkins is the Director of LACOE's Division of Juvenile Court Schools.  He is sued in his official capacity.  Defendant Elkins' official duties include operation of and supervision of the Division of Juvenile Court Schools, including the Challenger Center School.

36.    Defendant Lauren Ramos-Allen is the Principal of Challenger Center School, the LACOE school located at the Challenger Memorial Youth Center.  She is sued in her official capacity.  Defendant Ramos-Allen's official duties include operation and supervision of Challenger Center School.

37.    Defendant Los Angeles County Probation Department is a public agency with headquarters in Downey, California.  Probation's Office of Juvenile Institutions Bureau is responsible for the care of youth detained in the 18 juvenile camps, including those at Challenger, and 3 juvenile halls operated by Probation and the treatment components designed to assist detained youth in their transition back into society.  Under California law, Probation must ensure that youth detained at Challenger have access to constitutionally and legally adequate educational services, which are currently provided by LACOE, during their term of commitment.

## CLASS ALLEGATIONS

38.    Plaintiffs bring this action on behalf of themselves and all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23.

39.    The class includes "All youth who were detained at Challenger Memorial Youth Center at any point between January 12, 2008 and November 8,

2010."

40.　Class action status for this litigation is proper because:

(a)　the class of students is so numerous that joinder of all members is impractical in that Plaintiff maintains, upon information and belief, the class of persons consists of hundreds if not thousands of youth;

(b)　there are questions of law and fact common to the class and the claims of Plaintiff are typical of the claims of the class in that Plaintiffs are and were denied their fundamental right to education and educational equality, to minimally adequate educational services, to educational instructional without due process of law, and access to educational materials or services required by state statutes and the claims are not subject to unique defenses;

(c)　Plaintiffs will fairly and adequately protect the interests of the class as there is no conflict between Plaintiffs and the other class members; and

(d)　Plaintiffs can adequately represent the interests of the class members and have retained counsel experienced in class action litigation.

41.　Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole.

## FACTUAL ALLEGATIONS

### The Challenger Memorial Youth Center

42.　Defendant Probation Department operates the Challenger Memorial Youth Center in Lancaster, California.  Challenger consists of six probation camps, each of which houses approximately 110 youth, plus the SHU.

43.　Under California law, county offices of education, in conjunction with the county probation departments, are responsible for operating public schools for youth detained at county probation camps.

44.     Accordingly, LACOE operates, in conjunction with Defendant Probation Department, a public school that provides educational services to the youth held at Challenger: the Challenger Center School.

## Education Rights of Youth Detained at Challenger

45.     When states assume wardship of minors, they assume a special relationship with the minors and owe the minors, as part of the minors' liberty interest protected by the United States Constitution, minimally adequate care and treatment, including a minimally adequate education, appropriate to the minors' age and circumstances.

46.     In this regard, California law provides that each county probation department must administer juvenile facilities in such a way that they provide a "safe and supportive home and family environment" for the youth placed under their supervision. Cal. Welf. & Inst. Code § 880.   Furthermore, probation camps are required to provide "individualized guidance and treatment for juvenile offenders which enables them to return to their families and communities as productive and law abiding citizens." Cal. Welf. & Inst. Code § 886.5.

47.     Educational services play a central role in the mission of California's juvenile justice system, that of rehabilitation rather than punishment.  To have any chance of achieving that rehabilitative purpose, youth held in California juvenile detention facilities must, at a minimum, be provided with minimally adequate educational services suitable to their age and circumstances.

48.     Additionally, the State Constitution grants every child a fundamental right to an education and requires that all California children have "equal access to a public education system that will teach them the skills they need to succeed as productive members of modern society." *Hartzell v. Connell* 35 Cal. 3d 899, 906-09 (1984); *see also Serrano v. Priest* 5 Cal. 3d 584, 608 (1971) ("*Serrano I*") (same);

*Piper v. Big Pine Sch. Dist.* 193 Cal. 664 (1924)(same); *O'Connell v. Superior Court* 141 Cal. App. 4th 1452, 1482 (2006)(same). The fundamental nature of the right to education arises from "the distinctive and priceless function of education in our society," *Serrano I*, 5 Cal. 3d at 608-09, and the California Supreme Court has recognized that "education is the lifeline of both the individual and society," *id.* Under the State Constitution, a student may not be provided with a program of education that "falls fundamentally below prevailing statewide standards," *Butt*, 4 Cal. 4th at 685, 686-87, and any action that has a real and appreciable impact upon such right is subject to strict scrutiny. *Serrano II*, 18 Cal. 3d at 761, 767-68.

49.    California has set forth the content of the education guaranteed to each child by its constitution in specific terms: rigorous content standards describe what the State promises to teach and what students need to learn if they are to become competent members of our society and employable in today's economy.

50.    Although the State of California is ultimately responsible for ensuring the system of common schools does not deny equal educational opportunity to students in a particular school district, the California State Legislature has assigned much of the governance of public schools to local educational agencies that operate the schools. In its capacity as the educational agency that operates the Challenger Center School, LACOE is a local educational agency.

51.    LACOE, as a county office of education, is also statutorily responsible for overseeing and monitoring schools throughout Los Angeles County and ensuring that all schools in the county, including the Challenger Center School it operates, meet statutory and constitutional minimums for the provision of education as well as the responsibilities under IDEA to provide special education and transition services to students with disabilities.

52.    Defendants Robles, Elkins, and Ramos-Allen, as managing officers of LACOE and the school at Challenger, are responsible for ensuring LACOE operates

the Challenger Center School in a manner that fulfills its obligations under the Federal Constitution, the State Constitution, and state statutes. Accordingly, they must ensure students at Challenger Center School receive day-to-day instruction sufficient to meet federal constitutional standards of a minimally adequate education; ensure students at Challenger Center School are not unlawfully denied access to educational instruction and services; and ensure Challenger Center School operates consistently with state constitutional standards of providing each child with their fundamental right to equal educational opportunity.

53.     Defendant Probation Department, as the agency charged with the care and custody of youth held at Challenger, is responsible for ensuring Plaintiffs and students like them are not denied educational instruction and services to which they are entitled. State law explicitly imposes obligations on Defendant Probation Department to provide for the administration and operation of schools for youth detained at Challenger.

54.     Nonetheless, Defendants consistently fail to provide educational services to youth held at Challenger that meet either the state or federal constitutional requirements.

**Defendants' Policy and Practice of Denying Minimally Adequate Educational Services to Detained Youth, Appropriate to their Age and Circumstances**

55.     Defendants operate an educational system at Camp Challenger in Los Angeles County that determines each youth's educational program based on what service is available at any given time rather than what service the youth needs and is entitled to in order to receive the education mandated by state and federal law.

56.     For example, Defendants have failed to provide an appropriate screening mechanism to determine a youth's reading level and reading deficits and utilize research-based interventions to address those deficits, even though it is well documented that detained youth are substantially more likely than the general

population to have learning disabilities and reading deficiencies. They also have failed to provide any supplemental or remedial reading programs for the youth in their custody who require such programs in order to access basic grade level curriculum and content standards, and have refused to employ necessary staff, such as reading specialists, to meet the education mandate for all students.

57.     Defendants have further failed to establish a system to ensure that students with disabilities are provided individualized special education and transition services, even though it is well documented that detained youth are substantially more likely than the general population to have learning disabilities and other disabling conditions. They have refused to employ sufficient staff with experience working with students with disabilities, such as teachers with special education credentials and transition specialists, to meet the educational needs of such students.

58.     Defendants have also awarded students diplomas, terminating the provision of continuing education instruction, even when they have known that the student cannot even read or write or is so severely behind in reading and writing that could not possibly be in their interest to terminate educational instruction.

59.     The State of California clearly recognizes the importance of ensuring children are educated and taught to read, and thus requires reading to be taught early in a child's education. California content standards state that by the second grade students should be able to read aloud fluently, accurately, and with appropriate intonation and expression.

60.     The State's decision to mandate universal public education ensures that every child will be able to read and write fluently and independently, skills that are essential for self-sufficiency. When a child fails to master these skills, the negative consequences for that child and for society are myriad and serious.

61.     Literacy is the irreducible foundation for education. Students who cannot read or write are unable to access the curriculum, which is often structured on

the assumption that students can read materials and textbooks provided by the classroom teachers and can complete written assignments and examinations to demonstrate their mastery of the materials. For example, students at the high school level are generally expected to acquire knowledge in most subjects by reading textbooks and other materials independently. Students who cannot read or comprehend what they are reading are obviously unable to do so. Simply put, students who are not taught to read and write fluently and independently are not provided a meaningful or even a minimally adequate education.

62. The problems caused by illiteracy are even greater for youths in the juvenile justice system. Once involved with the juvenile justice system, minors with unaddressed reading deficits are far more likely to recidivate than minors leaving the system with adequate reading capabilities. Disturbingly, in Los Angeles, the typical detained youth is 16 years old, yet is reading at only a 5th grade level.

63. Tragically for both their own lives and for society, students who do not learn to read and write are more likely to commit crimes and be incarcerated as adults. One study reported that 82 % of prison inmates are high school drop outs, and a high percentage of these inmates were unable to read. *See* Ernest Fleishman, "Adolescent Literacy: A National Reading Crisis," *Scholastic Professional Paper* (2004), *available at* http://teacher.scholastic.com/products/READ180/overview/pdfs/Paper_LiteracyCrisis.pdf.

64. Furthermore, one study of the relationship between literacy and juvenile delinquency found that minors with reading deficits are disproportionately represented in detention facilities. The study concluded that providing quality educational services with a strong emphasis on literacy development was one mechanism that would reduce crime and recidivism among minors. *See* Project READ, *To Make a Difference*, REDUCED RECIDIVISM AND INCREASED EMPLOYMENT

OPPORTUNITY THROUGH RESEARCH-BASED READING INSTRUCTION 27 (M.S. Brunner, ed., 1993).

65.     Despite the central importance of literacy to a child's education and to rehabilitative programs for delinquent youth, and despite the disproportionate number of youth held in detention whose reading and writing abilities are below grade level, Defendants have refused to employ a protocol that screens youth for their reading ability using a research-based method that provides sufficient information about the student's reading level and the reason for any deficits from which to formulate an effective reading intervention strategy, or, if such information is available, to use this information to formulate an effective reading intervention strategy.

66.     In addition, LACOE Defendants have refused to provide the educational services necessary to overcome literacy and reading deficits.  Until recently, they employed no reading specialists and did not provide evidence-based reading programs to the youth who required them.  Even now, LACOE Defendants employ only a single reading specialist, despite the overwhelming evidence that numerous students in the Challenger Center School require access to evidence-based reading programs to address their serious reading deficits.

67.     Defendants also routinely award credits to students who cannot read or write, even when Defendants are aware of students' illiteracy.  Defendants also routinely award credits to student who are so severely behind in reading and writing, that they cannot meet the most basic state standards or complete grade level curriculum.  This practice is one means utilized by Defendants to attempt to conceal the constitutional deficiencies inherent in their denial of the fundamental right to education under the State Constitution and the right to a minimally adequate education under the United States Constitution.

68.     There is no excuse for these deprivations of fundamental education

rights. Nearly all students can learn to read with adequate intervention. Specifically, education research has demonstrated the effectiveness of structured, systematic, direct and explicit teaching of the English language reading code to older students who are substantially behind grade level in their reading ability. For example, programs that teach the reading code to students struggling with literacy through direct instruction in a structured, sequential and cumulative manner, using multisensory techniques, are recognized for their consistent effectiveness in remediating older students with reading delays.

69.     Although students often are enrolled at LACOE schools for short periods of time and spend, on average, six months in the LACOE schools at the probation camps, research shows that older students can make substantial gains in literacy within such a timeframe if provided appropriate evidence-based reading remediation programs.

70.     Accordingly, Defendants could and should have established a protocol that screens students for severe deficits in literacy and provides those in need of reading remediation access to an effective and appropriate reading intervention program based on the results of the screening assessment. Defendants were aware of the high rates of reading delays among the population served at the Challenger Center School and that certain programs could be implemented that would help those students overcome their problems, but they elected not to do so.

71.     The consequences of Defendants' wholesale failure to address the severe literacy deficiencies of students at Challenger are apparent: During the academic years ending in 2006, 2007 and 2008, no more than 5% of students in grades 9 through 11 at LACOE's schools performed at Proficient or Advanced on the language arts portion of the California Standards Test. Thus, fewer than one out of twenty students attending LACOE schools at probation camps and juvenile halls demonstrate competence with the grade-level language arts content standards

established by the state.  Defendants are well aware of these facts.

72.    Youth at Challenger are also routinely denied access to textbooks to use and to study with in violation of the "Williams Act" and the state constitution, even though such textbooks are available in sufficient numbers to be provided to students for use at school and in their dorms.

73.    Furthermore, youth are routinely denied access to state-mandated physical education classes and recreation.  In this regard, in spring of 2009, the Probation Commission found that no Physical Education classes were being provided to any youth at Camp Onizuka, one of the Challenger Camps, due to the failure of LACOE and Probation to resolve a dispute amongst themselves.

74.    Finally, youth at Challenger generally receive subpar educational instruction or little to no instruction at all.  Teachers do not show up for entire days of instruction, fail to ensure that there are substitutes to cover absences, take lengthy and unapproved lunches or arrive late leaving their classes uncovered and their students with nowhere to go, ignore assignments turned in by students and refuse to grade them, staple the state's educational standards to the wall and fail to teach them, screen inappropriate and non-educational movies instead of teaching the state's mandated educational curriculum, and otherwise fail to provide education instruction that could provide even a faint promise of what the federal and state constitutions and state education code require for these youth.

## Defendants' Policy and Practice of Arbitrarily Depriving Youth of Educational Services Without Providing an Explanation for the Removal or an Opportunity to Challenge the Exclusion

75.    Defendants have maintained a policy and practice of arbitrarily depriving detained children access to educational services for alleged disciplinary violations or for no apparent reason at all, with neither accountability nor oversight.

These deprivations occur without following minimal federal and state procedural protections that are clearly spelled out in court decisions, statutes and regulations and are designed to protect student's liberty interests and prevent the improper denial of educational instruction.

76.     Defendants routinely exclude juveniles from educational instruction as punishment, with no opportunity to challenge these exclusions.  Many of these exclusions are entirely arbitrary.

77.     In some instances, Defendants have denied educational instruction to students for requesting additional help in schoolwork.

78.     In other instances, they have placed juveniles in solitary confinement for months on end, without providing them the minimum hours of educational instruction required by state law and while denying them access to state mandated physical education and recreation.

79.     Entire classes of students have been removed from educational instruction due solely to an individual teacher's decision, without justification, to not teach that day or to punish the behavior of one student, with little accountability or oversight of the teachers for their illegal conduct.  On some school days, entire classes of students have been forced to stand outside in the rain in the winter or in the 100-plus degree heat during the summer as punishment, all the while being denied any and all educational services.

80.     On still other occasions, Defendants have removed children from state-mandated education instruction to perform menial tasks like sweeping and mopping floors, painting dorms, mowing lawns, and weeding.

81.     Still other students have been removed for arriving to class late, a circumstance that is most often not in their control while they are detained, or because they failed to properly greet the teacher.

82.     Although evidence-based methods for implementing class and school-

wide positive behavior supports that consistently reduce instructional exclusions by as much as 60 percent are available and known to the Defendants, they neither implemented such supports nor any type of reasonably adequate or minimally sufficient program to improve or correct the student's behavior.

83.     Students at the Challenger Center School are also being excluded from educational instruction in excess of the maximum number of days allowable per year by state law for legally valid suspensions, without receiving statutory or procedural protections, and in violation of the state mandate to use exclusions as a last resort and only after other means of remediation have failed.

84.     Thus, Defendants arbitrarily deny students access to educational instruction and services and fail to provide notice of the reason for the exclusion or an opportunity to challenge the basis for the exclusion from class. They maintain a pattern and practice of illegally excluding students from educational instruction for disciplinary violations, for no apparent reason, or because they lack space in the appropriate classroom.

85.     This pattern and practice has been going on for some time and has been repeatedly documented in publicly available reports. For example, in June 2009, a County of Los Angeles Probation Commission inspection team documented numerous instances in which students at Challenger Center School were removed from class and denied education instruction and documented that the youth were deprived of education services without being afforded an opportunity to challenge the deprivation. The inspection team observed that 14 youths were denied access to class because there were not enough teachers and noted that large numbers of students were removed from class, often within the first five minutes, and returned to their living areas without LACOE personnel attempting to resolve the issue that caused the removal. The inspection team also noted that LACOE staff often removed students from the classroom without completing referral paperwork stating

the reasons for the removal.

86.   Another report prepared by the Learning Rights Law Center in 2007 documented similar violations.  This report found that the minimum school day required by law is not being provided at all school sites at Probation camps and juvenile halls, that students are often removed from the classroom without a properly completed referral explaining the reasons for the removal, and that mandatory conferences to address the reason for the removal were not held.

87.   The Learning Rights Law Center report also noted that removals from class are not closely documented.  Accordingly, LACOE staff failed to deduct the time students miss as a result of referrals from the Average Daily Attendance reported to the state, which is the basis for the amount of state funding LACOE receives.  This means that the LACOE juvenile court schools received funding from the State based the purported attendance of students who had, in fact, been removed from the class for disciplinary or other reasons.

88.   A November 2009 report by the California Corrections Standards Authority found Defendant Probation out of compliance with state standards because youths held in the SHU at Challenger were denied access to school.  The report noted that youths in the SHU who were not in school either did not receive schoolwork or received work that the teacher threw under the doors to their cells.

89.   Students in the SHU who are allowed to attend class and meet with a teacher are deprived of a full school day.  Some students in the SHU receive only one-and-a-half to two hours of instruction each school day.  Thus, students assigned to the SHU, whether for disciplinary reasons or because of special treatment needs, are being unlawfully denied educational services, the opportunity to learn grade-level content, and the ability to earn credit hours that will allow them to advance in school and graduate.

90.   In May of 2009, the Youth Law Center notified Defendant Robles and

Robert Taylor, the Chief Probation Officer who is responsible for the management of Defendant Los Angeles County Probation Department, of these educational deficiencies in a letter discussing the aforementioned violations of the youth's basic educational rights and requested an immediate remedy. Nevertheless, and in spite of more than two years of reports detailing the extensive and egregious education failures at Camp Challenger, Defendants have failed to remedy the deficiencies.

## Other Conditions that Impede Effective Delivery of Minimally Adequate Educational Services

91.     Even outside the regular school day, youth at Challenger are subjected to conditions and conduct by Defendants' employees that undermine the delivery of educational services.

92.     As punishment for perceived misconduct, Probation staff frequently denies students food during meals or knocks the trays containing the food on the floor so that the youths cannot eat.

93.     Some youths who are confined to the SHU are not allowed to set foot outside and are confined to their cell for more than 20 hours each day. This isolation and sensory deprivation can lead to depression and apathy and exacerbate existing emotional and mental health problems.

94.     Additionally, as reflected in the November 2009 Corrections Standards Authority report, probation staff withholds U.S. mail from the students, resulting, at times, in a delay of one month or more between when it arrives at Challenger and when it is delivered to youths.

95.     Probation's conduct affects the youths' ability to attain educational benefit on the days when they are provided access to meaningful instruction. When students have been subjected to this kind of treatment outside the classroom, the students often come to school with a bad attitude, and it permeates throughout the classroom. Additionally, when students attend class hungry because they were

denied food at breakfast or lunch, they are not able to focus on the lesson.

## Class Representative Casey A.

96.     Casey was detained at various probation camps at the Challenger Memorial Youth Center in Lancaster for all but 13 months during the time period between October 2005 and September 2009.

97.     Casey attended schools run by LACOE while at Challenger.  Because he was detained, he had no choice but to attend these schools.

98.     Casey was found eligible for special education with a specific learning disability in first grade and remained eligible for special education throughout his primary and secondary schooling.  When Casey entered Challenger in October 2005, his then current individualized education program ("IEP") from Los Angeles Unified School District provided for placement in a non-public school.  Upon his enrollment at the Challenger School, however, LACOE placed Casey in a general education class in spite of his IEP.

99.     After approximately two months, LACOE finally placed Casey in a special day class, but did not provide special education; instead non-credentialed para-educators did his work for him.

100.    LACOE similarly failed to provide appropriate special education during Casey's subsequent detainments at Challenger and never provided him a transition plan or transitional services even though he was entitled to such a plan and services.

101.    By December 2005 at the latest, LACOE staff knew that Casey was not able to read or write.

102.    Because Casey could not read, a "para-educator" – a person not certified as a teacher – read materials aloud to Casey in the classroom.  If an assignment required Casey to answer questions, the para-educator read the materials to Casey, then read the questions to him and wrote down his oral answers.  At times, the para-

educator provided Casey the correct answer and simply required that Casey repeat the correct answer aloud.

103.   On March 31, 2009, a LACOE employee wrote, "Casey has demonstrated interest in Reading, but is unable to read on his own," and, "Casey has demonstrated interest in writing, but is unable to write on his own.  Casey needs to verbally tell someone what he's thinking and they write it down for him."  Even at this point, over three years since Defendants first discovered or should have discovered that Casey was illiterate, Defendants did not offer Casey appropriate remedial reading services.  Instead, the para-educator simply continued to read to Casey and write down the answers that Casey spoke aloud.

104.   Thus, rather than teach Casey how to read, Defendants allowed him to languish, leaving him farther and farther behind each year.  Instead of providing Casey with the minimally adequate services necessary to remedy his illiteracy, LACOE masked Casey's problems.

105.   Casey was discharged from LACOE schools in September 2009.  Although Defendants were aware of Casey's continued illiteracy, upon his discharge Defendants did not provide Casey the basic, functional transition services necessary for Casey to obtain appropriate reading remediation assistance upon his release.

106.   Despite knowledge of Casey's illiteracy, after his discharge from the Challenger, LACOE notified Casey by mail that he had attained sufficient credits to graduate high school and would be awarded a diploma at a ceremony in December of 2009.

107.   Casey received at least 64 documented disciplinary referrals during his time at Challenger Center School, and many of these referrals resulted in his exclusion from school for all or the remainder of the school day.  Casey was not provided notice of the reasons for removal, an explanation of the evidence supporting the removal or an opportunity to present his side of the story.  His parent

was never informed of the removals.  During those 64 days, Casey received no educational benefit and was completely denied his fundamental right to education.

108.   In any event, the number of days that Casey was out of class exceeds the yearly cap placed on school districts for suspension from classroom instruction. This cap is designed to stop school districts from failing to educate students like Casey who need more classroom instruction not less.

109.   Casey was assigned to the "work crew" during school days during his third term at Challenger in lieu of instruction time.  Probation staff removed him from class to work on landscaping tasks around the Camp grounds, including cutting the grass, for approximately half of the school day.  These assignments were in clear violation of the law.  In light of his documented and acknowledged inability to read or write, he needed additional educational services and intensive reading intervention assistance, not less time in the classroom, so the decision to limit his instructional time was unconscionable.

110.   As a result of Defendants' acts and omissions, Casey remains functionally illiterate and unable to read or write, even though he is intellectually capable of learning to do so.

111.   Casey desperately wants to learn to read and write.  He recognizes that his illiteracy will make it difficult for him to apply for a job, to execute a basic contract to rent an apartment or obtain utilities in his residence, to vote in an election, or to complete an application for a marriage application.

112.   Given the availability of reading remediation programs that would help illiterate students and other students with severe reading deficits learn to read and the critical importance of literacy to a youth's education, rehabilitation and ability to be self-sufficient in contemporary society, Defendants' failure to provide appropriate services to ensure that students at Challenger Center School are literate shocks the conscience.

### Class Representative Carl C.

113. Carl was found eligible for special education in third grade with an "other health impairment," due to auditory and visual processing disorders and visual-motor integration deficits, and remained eligible for special education throughout his primary and secondary schooling. When Carl entered Challenger in October 2007, his then current individualized education program ("IEP") from Los Angeles Unified School District provided for placement in a non-public school.

114. For approximately two months after Carl entered Challenger, he was placed in a classroom where he did not understand the assignments, and he repeatedly asked for additional help so he could succeed in the classroom. For example, he repeatedly told his teacher that was having trouble comprehending the reading passages contained on the worksheets she passed out to the class. Instead of receiving the assistance he requested, Carl was suspended from school for having the audacity to ask for more help.

115. LACOE never provided Carl a transition plan or transitional services even though he was entitled to such a plan and services.

116. When school administrators finally acknowledged his requests for additional assistance and concluded he would be better served in a different classroom, he was told that he would have to be on a "wait list" because there was not sufficient space in that classroom. Thus, the determination about what services he would receive was guided by what LACOE was willing to provide at the time, without regard to Carl's individual needs.

117. Throughout his time at Challenger, Carl has been disciplined by Probation staff for conduct outside the classroom in such a way that he is denied access to education. On at least eight occasions shortly after his arrival at Challenger, Carl was sent by Probation staff to "the box," which is disciplinary segregation in the SHU. Although he was supposed to be in class on those days, he was not provided

any educational instruction when he was in the box. As recently as this month, Carl was sent to the SHU for a half day and denied educational services during his confinement there, even though he was supposed to be in his class.

118. When Carl is sent to the box instead of attending class, he is suspended from school without being given notice of the reasons for the disciplinary removal from school, an explanation of the evidence to justify the suspension or an opportunity to present his side of the story and explain why he should be able to return to class or receive educational services.

119. As a result of his repeated exclusion from the classroom without access to a fundamentally fair procedure to determine the propriety of the disciplinary removals, Carl missed out on credits he must complete to graduate from high school, as well as any educational benefit on those days.

120. Additionally, Carl is not provided access to text books in his classes at Challenger. Instead, he is provided only with photocopies of a short section of a textbook. This policy and practice precludes him from referring to earlier lessons or other information that is included in the textbook but not in the photocopied section provided to him that day. He is therefore unable to refer back to foundational concepts and lessons that would be helpful to understanding the materials being covered that day in class.

121. Moreover, Carl has never been assigned homework and is not provided access to textbooks or other academic materials in the dorm. He is unable to study on his own and does not have an opportunity to review and master the concepts presented in class.

122. Furthermore, Carl was tested at an approximately 2nd grade reading level and yet is not being provided with instruction and services appropriate to meet his needs.

FIRST AMENDED COMPLAINT
28

**Class Representative Miguel B.**

123.  Miguel arrived at Challenger in July 2009.  On November 1, 2009, he was removed from the general population and placed in the SHU for disciplinary reasons.

124.  While he was housed in the SHU, his cell contained only a small cot. There were no windows except for a hand-sized opening covered with opaque plastic.

125.  On some days during his confinement in the SHU, Miguel received no educational instruction at all.

126.  On other days, approximately once or twice a week, the teacher shoved photocopies of school materials under his cell door.  On the days that materials were shoved into his cell, he did not meet with a teacher, interact with other students, or have an opportunity to ask questions if he did not understand the materials.  The teacher did not ever return to retrieve the worksheets.  He was not provided access to a text book when he was required to complete assignments in his cell.

127.  On days when he received educational services from a teacher, the length of instruction varied, but was never greater than two and a half hours.  On some days, he was brought out to the day room in the SHU to meet with the teacher for only 15 minutes.  On other days, he was brought out to the day room from approximately 9 a.m. until 10:30 a.m. and then again from 2 p.m. until 2:30 p.m. for school, which amounted to only two hours of school a day.  On a few days, he met with the teacher for one session that lasted two and a half hours.

128.  While he was in the SHU, Miguel never received tests or quizzes in his classes.  He would turn in completed worksheets to the teacher on days when he met with her in the day room, but he never received any of those assignments back with grades or comments.  As far as he knows, the teacher never looked at those completed assignments.

129.  Miguel was required to eat all his meals in his room.  He was taken to

the showers at around 4 p.m. each day, and, on some days, he was allowed to watch television in the dayroom for an hour or two after he finished eating dinner in his cell. He was not given an opportunity for recreation or physical exercise, although he did pushups and crunches and paced back in forth in his cell to pass the time. At all other times, he was locked in his cell. Thus, Miguel was forced to spend, at a minimum, 18 to 20 hours each day in his tiny cell.

130.   From December 23 until January 4, Miguel did not receive any educational services because of winter break. The only times he was let out of his cell during this time was to use the bathroom, for his daily shower, and for one or two hours in the evening on some days to watch television in the day room.

131.   Miguel was denied state-mandated education services, either through the complete denial of education programming on some days or through a truncated, school day on others, without ever having been afforded an explanation for the deprivation or an opportunity to respond to the allegations against him. Moreover, he was deprived of educational services as punishment for conduct that occurred outside of school and solely by virtue of his disciplinary placement in the SHU by Probation staff.

132.   The only time Miguel was allowed outdoors during the more than two months he was held in the SHU was one occasion when his school counselor demanded that he be allowed to meet with her in her office. Over the supervising probation officer's objection, she escorted Miguel outside to walk to her office and back to the SHU at the end of the counseling session. It had been so long since Miguel had been allowed outside that, when he first stepped into the sunlight beyond the SHU's outside door, he stood dazed, surveying the courtyard and lawn.

133.   Even before his placement in the SHU, Miguel was denied educational services arbitrarily and was not provided an opportunity to challenge the basis for his removal from class.

134.   On two or three occasions he was kicked out of class for allegedly disrupting class. He was returned to the dormitory and not allowed to return to class that day. He never met with school administrators to discuss the reason for his suspension. Moreover, his mother was never contacted or otherwise notified of the suspension.

135.   On at least three other occasions, Miguel was suspended from class because he needed to use the restroom. His teacher refused to allow students to use the restroom unless they had earned sufficient "points." On these occasions, Miguel did not have points, so when he asked to use the restroom, his teacher refused. When Miguel reiterated that he needed to use the restroom, the teacher told him that if he left the class, he would be considered AWOL and not allowed to return to class. Rather than urinating on himself, Miguel left class to use the bathroom, was returned to his dorm, and was not allowed to return to class that day. He never met with school administrators to discuss the reason for his suspension. Moreover, his mother was never contacted or otherwise notified of the suspension.

136.   Finally, on at least two occasions, Miguel witnessed an entire class of students who were returned to the dormitory at the beginning of the school day because the teacher did not let the students into class.

137.   Though Miguel had been eligible for special education since the third grade and remained eligible throughout his detention at Challenger, he was *never* provided special education or transition services during his detention.

## Defendants' Systemic Failure to Provide Adequate Educational Services

138.   Defendants Robles, Elkins, and Ramos-Allen are the LACOE officials charged with providing educational services to youth like Plaintiffs who are detained at Challenger. Plaintiffs, like other students detained at Challenger, had no choice but to accept the services Defendants provide while they are detained.

139.   Defendants have engaged in a pattern and practice of violating students' basic and fundamental rights to receive appropriate educational services.

140.   These failures have been documented in written reports by the County of Los Angeles Probation Commission, the California Corrections Standards Authority, and the Learning Rights Law Center, among others.  These reports are publicly available and are known to Defendants.  For example, Defendant Elkins was present at a meeting where the Count of Los Angeles Probation Commission presented an inspection report documenting the inadequate educational services and illegal exclusion of students from classes at Challenger Center School.

141.   Upon information and belief, Defendant Robles was also provided copies of all of the aforementioned reports, as well as the May, 2009 letter from Youth Law Center which refers to and cites from the Probation Commission report detailing a number of these allegations regarding the denial of the most basic educational opportunity.

142.   Defendants have also been informed about specific instances of the deprivations outlined in the foregoing paragraphs through internal written and oral communication from employees at Challenger who have become concerned with the state of affairs at Challenger.

143.   Given their knowledge of the repeated public reports documenting the woefully deficient educational programs and illegal deprivations of educational services, Defendants were personally aware of the violations and have failed to act to prevent them.

144.   The violations outlined above are ongoing and will continue unless this Court grants the relief Plaintiffs seek in this Complaint.

## CAUSES OF ACTION

### First Cause of Action—Violation of 42 U.S.C. Section 1983

**(Based on Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution)**

145.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

146.   Defendants, who are charged with providing educational services to juveniles who are detained at the Challenger Memorial Youth Center, have denied and continue to deny Plaintiffs and others similarly situated a minimally adequate education appropriate to their circumstances and needs, in violation of their substantive due process rights protected by the Fourteenth Amendment to the United States Constitution.

147.   Defendants were acting under color of state law, thereby violating section 1983.

**Second Cause of Action—Violation of 42 U.S.C. Section 1983**
**(Based on Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution)**

148.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

149.   Defendants, who are charged with providing educational services to juveniles while they are detained at the Challenger Memorial Youth Center, have denied and continue to deny Plaintiffs and others similarly situated a minimally adequate education, as compared to other students in Los Angeles County receiving an education in schools overseen, monitored, and superintended by LACOE, in violation of their right to equal protection of the law protected by the Fourteenth Amendment to the United States Constitution.

150.   Defendants were acting under color of state law, thereby violating section 1983.

**Third Cause of Action---Violation of 42 U.S.C. Section 1983**

**(Based on Violation of the Due Process Clause of the**

**Fourteenth Amendment to the United States Constitution)**

151. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

152. Defendants, who are charged with providing educational services to juveniles while they are detained at the Challenger Memorial Youth Center, excluded Plaintiffs from educational programming without providing notice, an explanation of the reason for the exclusion, and an opportunity to dispute the legitimacy of the exclusion, and continue to exclude Plaintiff Carl C. and others similarly situated from educational programming without providing notice, an explanation of the reason for the exclusion, and an opportunity to dispute the legitimacy of the exclusion, in violation of Plaintiffs' substantive and procedural due process rights protected by the Fourteenth Amendment to the United States Constitution.

153. Defendants were acting under color of state law, thereby violating section 1983.

**Fourth Cause of Action--- Violation of 20 U.S.C. Sections 1400 *et seq*.**

154. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

155. Defendants, who are charged with providing special education and transition services, as those terms are defined in 20 U.S.C. Sections 1401(29) and 1401(34) respectively, to juveniles while they are detained at the Challenger Memorial Youth Center, have failed to provide those juveniles with a free appropriate public education by denying them special education and transition services even though they were entitled to such services under IDEA.

156.   Plaintiffs have exhausted their administrative remedies under IDEA by pursuing and completing due process actions with the Office of Administrative Hearings.

## Fifth Cause of Action--- Violation of Article IX, Sections 1 and 5 of the California Constitution

157.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

158.   Defendants, who are charged with providing educational services to juveniles while they are detained at the Challenger Memorial Youth Center, have violated and continue to violate Plaintiffs' right and the rights of others similarly situated, pursuant to article IX, sections 1 and 5 of the California Constitution, to learn in a "system of common schools" that are "kept up and supported" such that students may learn and receive the "diffusion of knowledge and intelligence essential to the preservation of the[ir] rights and liberties."

159.   These constitutional provisions impose on Defendants the duty to provide Plaintiffs and others similarly situated an education that will teach them the skills they need to succeed as productive members of modern society.  A student who graduates from school illiterate or who is so severely behind in reading and writing that he cannot access grade level content or curriculum has been denied any sort of opportunity to attain an education that meets the standard established by the California Constitution.  Similarly, students who are denied the basics of an education or are outright excluded from accessing educational instruction or content are denied their right to a fundamental education.

## Sixth Cause of Action--- Violation of the Equal Protection Clauses of the California Constitution, Article I, Section 7(a) & Article IV, Section 16(a)

160.   Plaintiffs incorporate by reference the foregoing paragraphs of this

Complaint as though fully set forth herein.

161. Defendants, who are charged with providing educational services to juveniles while they are detained at the Challenger Memorial Youth Center, have violated and continue to violate Plaintiffs' right and the rights of others similarly situated to receive equal protection of the laws, pursuant to article I, section 7(a) and article IV, section 16(a) of the California Constitution, by failing to provide them with basic educational opportunities equal to those that other children in Los Angeles County receive.

## Seventh Cause of Action---Violation of Article I, Section 7(b) of the California Constitution

162. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

163. The State of California has established content standards and other commitments of care and services to Kindergarten through Grade 12 students, defining the education to which students are entitled. These commitments are among the privileges and immunities that may not be granted to some citizens or classes of citizens but not provided on the same terms to all citizens.

164. The ability to read and write independently and fluently, without assistance, is specifically included among the content standards for language arts, and many, if not most, students in public high schools have attained that standard.

165. The right to attend classes for statutory minimum number of days and hours per day is a right that all students in public schools enjoy.

166. Moreover, the right to be taught by a competent teacher who complies with the most basic professional standards is a right that most students in public schools enjoy.

167. Similarly, the right to receive state approved textbooks and materials for use at school and after-school is statutorily mandated for all students.

168.   In addition, the right to receive physical education and recreation in keeping with the state's minimum standards for such instruction is also a right enjoyed by most, if not all, public school students.

169.   Defendants, who are charged with providing educational services to Plaintiffs while they were detained at the Challenger Memorial Youth Center, have violated and continue to violate their rights and the rights of those similarly situated to receive privileges and immunities on the same terms as all other citizens by failing to ensure that the rights enumerated above were provided to Plaintiffs and others similarly situated.

### Eighth Cause of Action---Violation of
### Various California Education Code Provisions

170.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

171.   Defendants, who were charged with providing educational services to Plaintiffs at the Challenger Memorial Youth Center, allowed and continue to allow Plaintiffs and others similarly situated to be suspended from school by teachers and administrators for reasons not permitted under the education code and without being allowed to have an informal conference with the school principal to allow Plaintiffs to present reasons why they should not be suspended or the provision of written notice to their parents, in violation of Cal. Educ. Code §§ 48910, 48911, and 48900, *et seq*.

172.   Defendants, who were charged with providing educational services to Plaintiffs at the Challenger Memorial Youth Center, have and continue to suspend students from school in excess of 30 percent of the schools student's enrollment and have not implemented alternatives to suspension or considered other non-exclusionary methods of improving social skills and behavior, in violation of Cal. Educ. Code § 48911.2.

173.  Defendants, who were charged with providing educational services to Plaintiffs at the Challenger Memorial Youth Center, have and continue to suspend Plaintiffs and others similarly situated in excess of five consecutive schooldays, in violation of Cal. Educ. Code § 48900.5.

174.  Defendants, who were charged with providing educational services to Plaintiffs at the Challenger Memorial Youth Center, allowed and continue to allow Plaintiffs and others similarly situated to be suspended from school for more than 20 schooldays within a school year, in violation of Cal. Educ. Code § 48903.

175.  The State of California has set forth 240 minutes as the minimum schoolday for juvenile court schools, including the school at Challenger.  Cal. Educ. Code § 48645.3.  Defendants, who were charged with providing educational services to Plaintiffs at the Challenger Memorial Youth Center, failed to provide and continue to fail to provide Plaintiffs and others similarly situated with even the minimum schoolday.

176.  Defendants, who were charged with providing educational services to Plaintiffs at the Challenger Memorial Youth Center, failed to provide and continue to fail to provide Plaintiffs and others similarly situated with a physical education course of study that satisfies the California Education Code, which requires that schools provide students with "the courses of physical education for a total period of not less than 400 minutes each 10 schooldays" and that such courses have "emphasis given to physical activities."  Cal. Educ. Code §§ 51220(d) and 51222.

177.  Defendants, who were charged with providing educational services to Plaintiffs at Challenger Memorial Youth Center, failed to provide and continue to fail to provide Plaintiffs and others similarly situated with state approved textbooks and instructional materials so that each student has a textbook or instructional materials, or both, to use in class and to take home, in violation of Cal. Educ. Code § 35186(f)(1).

## REQUEST FOR RELIEF

Plaintiff requests relief as follows:

A.     An injunction directing Defendants, their officers, agents, and employees to fulfill their constitutional obligations by, among other things, screening and assessing for reading and writing disorders and providing intensive reading and writing remediation services in the form of ongoing and/or compensatory services suited to the individual needs of current, former and future students at Challenger Center School who were and are unable to read, comprehend, and write independently and fluently when they enrolled at Challenger Center School, and therefore were and are unable to access grade-level materials and content on their own and meet grade level standards.

B.     An injunction forbidding Defendants, their officers, agents, and employees from excluding students from the classroom for non-statutorily defined and impermissible or arbitrary reasons and without providing notice and an opportunity to be heard to challenge the basis for removal or to receive state statutory protections related to removals, and directing Defendants, their officers, agents, and employees to fulfill their constitutional and statutory obligations by providing educational services covering the academic content that illegally suspended students missed.

C.     An injunction forbidding Defendants, their officers, agents, and employees from denying Plaintiffs and others similarly situated from receiving the protections, privileges and immunities on the same terms as all other citizens by failing to ensure that the right to, among other things, read and write independently and fluently, without assistance, to attend classes for statutorily minimum numbers for days and hours per day, to be taught by a competent teacher who complies with the most basic professional standards, and to receive physical education and

recreation in keeping with the state's minimum standards are provided.  An injunction forbidding Defendants, their officers, agents, and employees from depriving students of even the statutorily defined mandatory minimum number of education instructional minutes, physical education, textbooks and instructional materials, and directing Defendants, their officers, agents, and employees to fulfill their constitutional obligations by providing educational services covering the academic content that the students who were deprived of such educational instruction missed.

> D.    A declaration that Defendants' actions violate Plaintiffs' rights to substantive due process under the Constitution of the United States;

> E.    A declaration that Defendants' actions violate Plaintiffs' rights to procedural due process under the Constitution of the United States;

> F.    A declaration that Defendants' actions violate Plaintiffs' rights to equal protection under the Constitution of the United States;

> G.    A declaration that Defendants' actions violate eligible Plaintiffs' rights under IDEA;

> H.    A declaration that Defendants' actions violate Plaintiffs' rights under Article IX, Sections 1 and 5 of the California Constitution;

> I.    A declaration that Defendants' actions violate Plaintiffs' rights under the Equal Protection Clauses of the California Constitution, Article I, Section 7(a) & Article IV, Section 16(a);

> J.    A declaration that Defendants' actions violate Plaintiffs' rights under Article I, Section 7(b) of the California Constitution;

> K.    A declaration that Defendants' actions violate Plaintiffs' rights under the various California education code provisions listed above;

> L.    Compensatory educational services for Plaintiffs;

> M.    Compensatory transition services for Plaintiffs;

N.    Monetary damages for class representative Miguel B.;

O.    Costs of suit pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988;

P.    Attorneys' fees pursuant to 42 U.S.C. § 1988 and Cal. Code Civ. Proc. §1021.5 and any other appropriate statutory basis; and

Q.    Such other relief as this Court deems just and proper.

Respectfully Submitted,                    ACLU Foundation of Southern California

Dated:  February 10, 2011          By: _____
                                            Mark D. Rosenbaum
                                            Public Counsel

Dated:  February 10, 2011          By: _____
                                            Laura Faer
                                            Disability Rights Legal Center

Dated:  February 10, 2011          By: _____
                                            Shawna L. Parks
                                            Attorneys for Plaintiffs

## PROOF OF SERVICE

### *Casey A. v. LA County of Education and LA County Probation Department*
### *CASE NO.: CV 10-00192 GHK (FMOx)*

I certify that I am authorized to serve documents in this action, as I am over the age of 18 and not a party to the action. I am employed at the Disability Rights Legal Center, in the office of a member of the Bar of this Court at whose direction service was made. My business address is 919 Albany Street, Los Angeles, California 90015. On February 10, 2011, I served the following document(s):

### FIRST AMENDED COMPLAINT

__X__  BY ELECTRONIC MAIL:  I caused such document to be served via electronic mail (e-mail) on the parties in this action by transmitting a true copy to the e-mail addresses listed for each party.


__X__  OVERNIGHT MAIL: I placed a true copy of the foregoing document(s) in a sealed envelope addressed to each interested party as set forth above.  I placed each such envelope for collection and mailing at a Federal Express Location, Los Angeles, California. I am readily familiar with Federal Express's practice for collection and processing of correspondence for mailing and delivering. Under that practice, the correspondence would be picked up by Federal Express on that same day in the ordinary course of business.

True copies were transmitted via electronic mail and overnight mail to and served upon:

*Attorneys for Defendant  Los Angeles County Probation Department*
Roger Granbo, Esq.
Office of County Counsel
500 W Temple St 6th Fl
Los Angeles, CA 90012
Telephone: (213) 974-1609
Fax: (213) 626-2105
Email: rgranbo@counsel.lacounty.gov

1

*Attorneys for Defendants Jon Gundry, William Elkins and Jesus Corral*

2   Vibiana Andrade, Esq.

3   General Counsel, LACOE

    9300 Imperial Hwy
4
    Downey, CA 90242
5   Telephone: (562) 922-6123

6   Fax: (562) 401-5452

    Email:Andrade_Vibiana@lacoe.edu
7

8

9        I declare under penalty of perjury under the laws of the State of California

    that the foregoing is true and correct.  Executed on February 10, 2011, at Los
10  Angeles, California.

11

12

13

14                                         _____

15                                              Jessica Bohorquez

16

17

18

19

20

21

22

23

24

25

26

27

28